The first case today is No. 24-1509, Amber Levine v. Great Salt Bay Community School Board et al. At this time, would counsel for Appellant Levine please come to the podium and introduce themselves on the record to begin? Thank you, and may it please the Court. Adam Shelton for Appellant Amber Levine, and with the Honor's permission, Judge Montecalvo, I would like to reserve three minutes of my time for rebuttal. You may have three minutes. Thank you. Ms. Levine's 13-year-old child was given chest binders by her school social worker. Chest binders are intimate undergarments meant to compress breasts so that the wearer appears more masculine. The child was given these chest binders by the social worker in his private office. The social worker instructed Ms. Levine's child how to use these chest binders and informed the child that he was not going to tell Ms. Levine, and that the child need not do so either. Now, the social worker kept his word. Ms. Levine did not find out about this. Could I focus you in on the policy issue here? Absolutely, Your Honor. And in specific, what your argument is about what the policy was? Correct, Your Honor. At this stage of litigation, I think Ms. Levine has played sufficient facts to permit reasonable inferences to lead to one of two conclusions. Either it was the policy of the Great Salt Lake Community School District here to allow school officials to make decisions and take actions that directly affect the mental health or physical well-being of a child without telling parents, or it is now the policy of the school district because it has ratified the actions of the school officials. Let's just aggregate those. As to the first, so there was an unwritten policy that existed prior to the school counselor doing what he did. What are the facts you think create a reasonable inference that that happened? Start with that. And then don't tell me about ratification. Yes, Your Honor. So for that aspect, we have both that the child was given chest binders, that the child was called by a different name and different pronouns, by not just a school social worker but by multiple school officials. So what we have there is multiple instances across multiple individuals. No one ever told Ms. Levine about it. And then I think... But what makes us believe that was, they had any interest in, other than the counselor, why would those people think, oh, I should be telling the parent? I mean, I'm just a teacher who's been told this child is going to go by they as a pronoun. What would make me think, oh, yes, I should go tell the parent? Like, where does that come from? Right, Your Honor. So I think there's a constitutional aspect to this as well, but I'll focus right now on the policy aspect. The school had a written policy that required the involvement of parents. Ms. Levine here was not involved. It required the involvement of parents in what way? What did the words say? I think the policy says that when they're going to create sort of this transgender plan, a plan for how to handle... What does a plan mean in that written policy? I'm not sure exactly what plan means in that written policy, Your Honor, but what we have... Is there anything in the complaint that tells us what the school officials, school board, et cetera, thought plan meant? I don't think there's anything in the complaint about what the school officials thought plan meant. Okay, that's a good answer. Thank you. I think what we have here, though, is the school board has, throughout the briefing, admitted that what happened would have violated the policy. So the policy says, in addition to I know the part you're relying on, it also says, these guidelines are not intended to anticipate every possible situation that may occur since the needs of students and families differ depending on the student's age and other factors. So aren't they building sort of... You're saying that the written policy had no discretion, but it looks like that sentence did import some discretion into the policy. Your Honor, I think that discretion actually helps our argument because it shows that there can be the existence of additional policies that are in play here. What we have here is a violation of the written policy, and then the crux of this case is that after Ms. Levine complained about it to both the principal and the superintendent, the superintendent being charged with knowing and enforcing the policy to the school, the superintendent came back two days later and informed Ms. Levine that no policy had been violated. Now, the fact that no policy had been violated wouldn't mean much in a vacuum. It doesn't necessarily mean in a vacuum that a different policy existed. But in the face of a written policy whose guidelines were violated, again, the defendants have said that the actions that happened here would have violated their policies. I think there's a reasonable argument and a reasonable inference that a plaintiff is entitled to at this stage that there was this sort of policy at the time of the incident. Why isn't it equally reasonable, if not more reasonable, that there's simply no policy addressed this issue? I think, Your Honor, because there was a written guidelines, and there are written guidelines that kind of set out what the process was, and those guidelines weren't followed here, and the school board admitted through... But if we return to Judge Howard's point, I mean, a plan should be developed. Is giving a chest binder on one incident by a school counselor a plan? I think your answer was, well, we don't really know. Your Honor, I think that that by itself might not necessarily be a plan, but I think when you combine that with the calling of the child a different name and different pronouns, I think that becomes a plan. I think that then leads to a different question of what was the point of the guidelines. If school officials can give a child a chest binder and call a child by a different name and different pronouns, and treat that child as a different gender or as their gender identity rather than their biological sex, if that isn't creating a plan, I'm not sure I would see where the plan then would come into effect if it was not in effect with those situations and those circumstances, Your Honor. Just so I'm clear, we have the transgender student guidelines, right? Those are written?  Are you saying that the policy that was violated is written specifically into the three pages we have here or that we infer from that, the guidelines here? The policy that we're challenging or the policy that we're saying was violated? The policy that you're challenging. No, we're not saying that the policy that we're challenging is in the guidelines. What we're saying is that the existence of the guidelines coupled with the post-event evidence that happened leads to a reasonable inference that there was a separate policy that was in place at that time, given the superintendent's statement that no policy was violated, given the school board's two statements, one in December of 2022 and the other of January 2023. The January school board statement isn't that clear, right? We don't think a policy was violated that requires any action at this time. That really could mean a lot of different things, right? Your Honor, it can mean a lot of different things, but I think when that's combined with everything else, I think it points clearly towards the fact that there was a policy that existed at the time, especially given the fact that there has been no public statement by the school board or by anybody involved to the contrary or indicating that this wasn't what was supposed to happen. Does the complaint allege anything about the treatment of any other children other than the plaintiff's child? No, Your Honor, it doesn't, but I don't think that's necessary for proving a pattern of practice given the fact... No, I just want to pin down, it doesn't say anything about any other children? It doesn't say anything about other children with respect to the guidelines. It says something about Ms. Levine having two additional children. With respect to the guidelines, what about the unwritten policy that you say exists? It doesn't say anything with respect to other children. So there's no allegation in the complaint beyond this individual? Correct, Your Honor, but again, I don't think that's necessary for the policy pattern and practice aspect because we are pointing to multiple instances of this one child. It wasn't just this one school official or two school officials, it was multiple school officials, and it was over a period of time, both with the chest binders and with the calling the child of a different name and different pronouns, and no one ever informed Ms. Levine of the situation, and I think there is a reasonable inference that could be made that the information must have been purposely withheld from her, given the fact that this was done over a period of time, given the fact that the school social worker, by statement, says he is going to purposely withhold it from her, and the fact that between parents and school officials and school teachers, there are numerous interactions that happen on a day-by-day, a week-to-week basis, and Ms. Levine was never informed of it, and there's no indication that any school official would have ever informed Ms. Levine of this. She only discovered this when she was helping her child clean the child's room in preparation for a winter painting project. You just said day-by-day, there were day-by-day instances. Do you allege those in your complaint? We don't allege day-by-day instances in the complaint, but I think the very nature of The very first question Judge Aframe asked you, you listed, I think, three facts, right? Those are the facts that are in the complaint. There aren't more. Well, those three facts, there are additional facts in the complaint, not related to the day-by-day activities, but more of the post-event evidence that shed light on what the policy was, as this court said in the Borderell case in 1989, that post-event evidence can be used to shed light on what the policy was at the time of the election. Why is it not just as likely? Because you have to show a plausibility, not just a possibility. Why isn't it any more likely that school counselor reads policy that seems to imbue some discretion? He then goes ahead and does whatever he thinks is right, and then afterwards, there are some statements made that are kind of vague and all over the place, but they never say there's a direct policy violated. What about that makes it more plausible that before the social worker acted, there was some concerted custom or policy that had been actually developed, as opposed to the social worker just making a decision, and then sort of the school board kind of sort of dancing around whether it was wrong or not? You know, I think that also then bleeds into the ratification issue. What it is, is it's all the post-event evidence. It's all the evidence, when taken together and looked at holistically, makes it plausible. Now, you agree that the ratification can only be done by the school board, not the superintendent or the principal? Correct, Your Honor. The ratification can only be done by the school board. That's what we're arguing. We're arguing that there are two different instances where the school board ratified the conduct. So one is that January 14th one, where I say, well, that's kind of unclear exactly what they're saying. What's the other one? The other one is the fact that the school social worker was given a second-year contract union, obviously, by the school board. That was done after this complaint. Don't people, I mean, people get their jobs renewed when they've done things that aren't perfect, right? That happens all the time. Your Honor, I think there's a difference between doing a job not perfectly and doing a job in a way that leads to a public controversy and that violates policy. But that seems like a very extreme inference. He had to be fired. That's the only possible outcome unless they ratified what he did. I mean, there seemed to be many gradations of that before he had to be fired. Your Honor, our argument isn't that he had to be fired. It's that the fact that they then renewed his contract unanimously, again, when taken together with the school board statement that said that it was aware of no policy violation at this time. I think that when you look at the facts holistically and give Ms. Levine the reasonable inferences entitled to, there really only are two kind of logical conclusions that stem from this and the facts here. It's that either it was the policy or that it is now the policy through ratification. You have several claims of relief or future relief. Do I have this right that the plaintiff here no longer has children in this school district? And does that give rise to a question as to whether you have standing on some of those claims? Not in our opinion, Your Honor, because the plaintiff does have two additional children who are two and four at the time of the filing of this complaint. And under Maine law, a child between the age of six and 17 is required to go to a public school unless an approved alternative school is found. So the default in Maine law is that the child will go to a public school and this is the school that the child and the children would be zoned for. And I think that again goes to ratification. And the causation argument with ratification is that she will have to send children to school in the future. And if this policy and this policy is still in effect by ratification, then that has cost her injuries by requiring her to send her children to a different school. Okay. Thank you. Thank you, Your Honor. Thank you, counsel. At this time, would counsel for the appellees please introduce herself on the record to begin? May it please the Court. My name is Melissa Huey and I represent the Great Salt Bay Community School District. The plaintiff concedes in this case, as she must, that in order to state a claim under Section 1983, she has to meet the Monell standard. And as the Court seems to have been discussing earlier, that's a pretty high hill to climb in this case because, in fact, the school district has two formal policies on paper that are contrary to the policy that she bases her claim around. So we have the transgender policy that provides, and I just want to point the Court to Appendix 38, that a plan should be developed by the school in consultation with student, parents, guardians, and others as appropriate to address the student's particular needs. So the formal policy of the board required the parents to be involved in... But their argument is, there's that, and then there's a bunch of statements that seem to suggest that wasn't violated. And so the inference they draw is, that wasn't violated, therefore there was some prior understanding that that's not what this really meant, and that it was okay for the social worker to do what the social worker did. So it's the combination of, they didn't seem to follow this language, and then they say this language wasn't violated. And that's the constellation of facts that they say makes it plausible that something happened earlier. Okay, so two points on that. The first is, we have to look at the precise allegations of the complaint. And we've heard a lot about the superintendent speaking with the parent, and what is actually alleged, I think it's at Appendix page 16, paragraph 33 of the complaint, is that the parent came, told her story, and the superintendent expressed concern. She didn't say, oh, well that's not a violation of our policy. She expressed concern, which indicates that if what she was hearing was accurate, it would be a violation of a policy. It was only after she went and did some investigation, found out what really happened, that she came back and said there has been, in her view, no violation of the policy. That's number one. But number two, and I think equally or more importantly, as this court and the Supreme Court have recognized in the Whole Foods case and Thwombly, that if there is an obvious alternative explanation that we're not just looking at reasonable inferences, we're also looking at those obvious alternative explanations. Here, there's an obvious alternative explanation, and that is the parent came, gave the superintendent some information, the superintendent investigated, and found out that there had not been a violation of the board policy. And she was speaking, and I think it's clear from the allegations of the complaint, that she was saying the board policy has not been violated, not some secret policy. And I think that's important, because what they're saying, and we need to be ---- Counsel, I'm sorry. I know you're right in the middle of a point. So when you read to us the policy, you used the word plan. At the end of the sentence, there was the word appropriate. Have the defendants taken any position on what the word appropriate modifies as appropriate? Is it modifying parent, guardian, other person, or is it modifying consult with the parent? It says, and I think it modifies others. I think that's pretty clear from the language. Okay, good. That's all I needed. Okay. There. So I would like to get back to what I was saying, but I have no recollection at all of what it was. I think I was just talking about the obvious alternative explanation. Are you saying that the obvious alternative explanation is a matter of fact, what the mother was claiming just isn't what happened? Is that? I think there are a number of obvious alternative explanations. One is that upon investigation, it was clear that the policy had not been violated. Another is that as the school board articulated in its statement, that there are also at play here state law requirements of what a social worker can and cannot reveal about the communications with its- And that was known already to the school board, right? That statute had been there. Yes. So there was a statute in place that sends you down a different road than a just- if I just looked at the transgender policy. So why isn't it inference that we had a previous understanding of what this statute required of us, and that's our policy? That was our policy in line with the main statute, if that was already known to everybody involved all along? Well, a couple of reasons. The first thing here is what we have to remember is what we're talking about here is whether there's a secret policy that conflicts with the written policy, and that policy under abysmal has to be so permanent and well-settled as to constitute- That makes it sound evil. It's not evil. It's the idea that there's a statute that talks about the obligations of social workers and counselors, and so to the extent we write policies like the transgender policy, it's against the background of the statutory scheme, which sets out a bunch of rules, and so we understand and have always understood and tell our counselors that we have our written policies in light of what the main statute is. And that's absolutely correct. And why is that not a custom then? Because it's not a custom of withholding information as they claim. The custom, and I think it's important here to remember that in establishing a custom, they need to show more than one incident, and here, as the district court found, the only factual allegations pled in the complaint include one allegation where the social worker said allegedly- So on that point, are you familiar with our decision in Haley? Have you read that in preparation for today? I have. So I went back and pulled the complaint in that case. I'm not familiar with the complaint. I'm going to frankly admit that. I'll represent to you what it said. It just talks about one instance where the Boston Police Department officers didn't produce Brady material, and then they make a relatively conclusory allegation that says, and we allege that there is a policy, a de facto policy, of Boston police officers not turning over Brady material. There are no other instances required, and this court said that got past 12B6 based on that allegation alone. So I'm not sure where we get the you need multiple cases. So I think there are a couple of things. The first thing here is that this is a different case because we have specific written policies that say the parent will be involved at every step of the way and prohibit staff from keeping secrets. So in order to nudge this case over the plausibility line, we need to have some facts that show that there is a secret policy that is different from the written policies. I don't think that was there in Haley. So that's number one. And number two, whereas I don't know that there were reasonable alternative explanations in that case, there certainly are here. So I think that that case is very clearly distinguishable from this one. If I could spend just a couple of minutes on the ratification issue, because I think that that particular claim fails as a matter of law. The reason being that ratification cases generally occur in things like terminations where the municipal body can go in and overturn the termination, correct the alleged constitutional violation, or school suspension, same thing, the school board can come in, overturn, correct. And if they do not overturn and correct the alleged violation, then the municipal body can be a moving force behind the constitutional violation. Here, there is no allegation and there is no possibility that the school board, by writing the January 2023 letter, was a moving force behind the alleged constitutional violation here. By the time the school board had written that letter, the alleged constitutional violation had already occurred. There is nothing the school board could or did do to affect the constitutional rights of the parents. So I don't think that ratification applies here. I think I agree with the plaintiff's counsel that those facts can go to the plausibility of whether there is a secret withholding policy. But I don't think that ratification is a part of this case. And I just wanted to be clear about that. So I think what we come down to when we're talking about whether there is this secret custom or usage that's so permanent and well-settled as to really be a law, what we're looking at is the three things that counsel mentioned. The statement of the superintendent, and we've already talked about the obvious alternative explanations there. We're looking at the statement of the school board. And I think that you, Judge Aframe, have looked at that statement pretty carefully, so I won't reread it. But I think that the statement itself makes clear, A, that they're only talking about, that it says the board's policies comply with main law and neither the board nor school administration are aware of any violation of the policy or law which requires further action at this time. That, to me, does not say there is another secret policy. And it also includes in the very body of the letter other obvious alternative explanations, i.e., the confidentiality statute and the need for a school board to weigh and take consideration both of the rights of parents and also state law obligations on its employees. So there's that. And then finally, there's this rehiring of the social worker, which I would point out first is not pled in the complaint, and since we're talking about a 12B6 pleading issue, I think that's significant. But even if it isn't, because I suppose the complaint could be amended, so I guess I won't stand on procedure, as Judge Aframe pointed out, there are times all over the country, all over everywhere where employers make a decision to keep somebody to continue their employment, even if they have engaged in some sort of misconduct. So I don't think we can read anything into that. It may be that the issue had been addressed. It may be that the decision was that it wasn't misconduct. It may be that they were desperate for social workers. There are a lot of alternative explanations. And I don't think that that does anything to nudge this secret policy over the plausibility. Here's what troubles me. So that was a good summary. And here's what troubles me at the end of it all. So this is asking about an area that it seems to me it's very hard for the plaintiff to get at the key facts, which are what happens behind the scenes in meetings or discussions in the school district. And so how should we think about that problem? Where they say a lot of things that you can line up and make an argument that maybe something did happen behind the scenes. They have a written policy. There does seem to be some inconsistency. They do make assertions that maybe you can say align with saying nothing went wrong here. And then they say and that's all we can know because that's what's out there. And then behind the scenes maybe there was some discussion and we just can't know that. And how do we think about that in the 12B6 sort of area where those things are hard to know? Well, I think that anybody can say that about almost any claim. So you look at Twombly, you have these tele-providers, upstarts who are looking at the way the pricing is going. They suspect that there's concerted activity. They allege on information beliefs that there's concerted activity. The Supreme Court says no, that's not enough. That's not enough. You don't get discovery. And there's nothing in Twombly or Iqbal or anywhere or any decision of this kind that you can believe anywhere that carves out an exception to the Iqbal-Twombly rule for Monel. I will acknowledge this is pre-Iqbal and Twombly. But some latitude may be appropriate where a plausible claim may be indicated on what is known to the plaintiff at least when some of the information needed may be in the control of the defendant. So the other thing I would say, if I can please, is that just as a practical truth of the matter, this is a tiny community in mid-coast Maine that could practically fit in this courtroom. If there was a policy or a custom of doing this kind of thing, everybody would know it, and they would have access to those facts. Thank you. Thank you, counsel. At this time, would counsel for the appellant please reintroduce himself back on the record? You have a three-minute rebuttal. Thank you. Adam Shelton for appellate Amber Levine. A couple points I'd like to make right off the bat. First, as far as the obvious alternative explanations, I think the way that the school board is trying to make that argument is asking the court to presume different facts that aren't in the record and to kind of defeat the general requirements that courts give reasonable inferences to plaintiffs and take all the facts as true, specifically with reference to what other investigations the superintendent or the school board may have made. But I also want to address specifically the main social worker law that allows confidentiality. But the law only allows confidentiality for information learned, so that wouldn't necessarily apply to conduct. And here what we're challenging is not that the social worker kept information about the child being transgender or having different gender identity from the parent, but that the information that was kept was that the social worker took an active step of giving the child the chest binder. An additional point on that is that... They may have been wrong about that, but I think their point is when we thought about post whatever he did, we thought about that statute and maybe we didn't get it right, but we think that might be the reason we're saying that there was no violation. And that gets to the second point of it, is that law wouldn't apply at all to all the other school officials who called the child by a different name and different pronouns, as it only applies to social workers. So I think that's an important thing to keep in mind. As far as the staff conduct policy, which prohibits the keeping of secrets, that also mandates some sort of punishment. So what we have here is there's no public punishment that's been made over a violation of policy that does mandate punishment. It uses mandatory language. As far as... I'm sorry, you read Roy saying the student doesn't have to tell their parents, is Roy saying to the student you have to keep a secret? I don't think it's Roy saying to the student that she has to keep a secret. It's that it can be kept a secret and then when coupled with him saying that he wasn't going to tell her parents. I think there's reasonable inference that that is a violation of the staff conduct policy, which I think my friend just alluded to. I also want to point out as far as ratification goes, Ms. Levine in her complaint at paragraph 18 alleged that she only removed her child from school because of the school's unlawful conduct. If the school had not ratified the conduct and had said that what happened was a violation of law, that it was going to make its policy more explicit, something along those lines, that she would have kept her child at the school. That was when the Registry pulled her child out of the school, and that's something that the defendants at the school would actually admit to when they filed their answer to paragraph 18 of the complaint, appendix 13. Lastly, I also want to say we don't have to allege. Just zoning and a ratification, though. It would have to be the school board statement on January 14th. The January statement from the school board would have to be the ratification, not what the principal said, not what the superintendent said, what the school board said on that date, right? Correct. It would have to be what the school board said on that date. And that's the only statement by the school board, that January statement. There's a December statement as well that's not as explicit, but the January statement is the basis for the ratification, both on her removing her child from school and then her additional children. Okay. Thank you. Thank you. Thank you, counsel. That concludes argument in this case.